# IN THE SUPREME COURT OF CALIFORNIA

Conservatorship of the Person of E.A.

PUBLIC GUARDIAN OF CONTRA COSTA COUNTY,
Petitioner and Respondent,

v.

E.A.,
Objector and Appellant.

S287241

First Appellate District, Division One
A169299

Contra Costa County Superior Court
P20-00896

July 23, 2026

Chief Justice Guerrero authored the opinion of the Court, in which Justices Corrigan, Liu, Kruger, Groban, Evans, and Delaney[*] concurred.

---

[*] Associate Justice of the Court of Appeal, Fourth Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Justice Liu filed a concurring opinion in which Justices Kruger, Groban, and Evans concurred.

CONSERVATORSHIP OF E.A.

S287241


Opinion of the Court by Guerrero, C. J.


The Lanterman-Petris-Short Act (LPS Act; Welf. & Inst. Code, § 5000 et seq.)[1] authorizes a court, upon the petition of a designated public official, to impose an involuntary conservatorship over a person found to be gravely disabled. A proposed LPS conservatee has a right to demand a court or jury trial on the issue of grave disability. By statute, a trial on grave disability must commence within 10 days of the proposed LPS conservatee's demand, with an additional 15 days available at the request of the proposed conservatee. If a proposed LPS conservatee is found gravely disabled, the court may impose a conservatorship over the conservatee's person and estate. The conservatorship automatically terminates after one year, but the conservator may petition to renew the conservatorship each year if the conservatee remains gravely disabled. For each renewal, the conservatee may again demand a court or jury trial on the issue of grave disability.

Appellant E.A. accepted an LPS conservatorship in 2020 and accepted its renewal in 2021. After her conservator petitioned for a further renewal in 2022, E.A. demanded a jury trial on the issue of grave disability. Her trial was delayed by nearly a year, largely because of resource constraints and court congestion. E.A. repeatedly objected to these delays and moved

---

[1] Subsequent statutory references are to the Welfare and Institutions Code unless otherwise specified.

1

to dismiss the proceedings as a violation of her statutory and constitutional rights. When her case was eventually called to trial, she accepted renewal of her conservatorship pursuant to an agreement with her conservator that she be placed in a less restrictive setting.

E.A. appealed that conservatorship order, including on the ground that the pretrial delays violated her constitutional right to due process of law. The Court of Appeal found no due process violation and affirmed. It analyzed the due process question using a four-factor test originally announced by the United States Supreme Court in *Barker v. Wingo* (1972) 407 U.S. 514 (*Barker*) in the context of a criminal defendant's right to a speedy trial under the Sixth Amendment, which we adopted for use in the context of pretrial delays in sexually violent predator commitment proceedings in *Camacho v. Superior Court* (2023) 15 Cal.5th 354 (*Camacho*).

In this court, E.A. contends the Court of Appeal erred by using the four-factor *Barker* test instead of the more general due process framework discussed in *Mathews v. Eldridge* (1976) 424 U.S. 319 (*Mathews*) and *People v. Ramirez* (1979) 25 Cal.3d 260 (*Ramirez*). We disagree. The *Barker* test is tailored to the type of constitutional error at issue here, and it is sufficiently flexible and responsive that its origins in criminal law do not hamper its utility in this very different proceeding.

Applying the *Barker* test here, we conclude that E.A.'s due process rights were violated by the nearly year-long pretrial delay. By extending almost the entire length of a one-year LPS conservatorship, the delay effectively nullified E.A.'s right to a meaningful opportunity to be heard prior to the deprivation of her liberty. Further, the delay was primarily caused by resource

constraints and court congestion, and E.A. clearly and repeatedly insisted on her right to a timely trial. While E.A. has not shown substantial prejudice beyond the fact of her pretrial commitment, the lack of such prejudice does not overcome her showing under other *Barker* factors.

Under *Barker*, "the only possible remedy" for violation of the Sixth Amendment speedy trial right in a criminal proceeding is "the unsatisfactorily severe remedy" of dismissal or reversal of the resulting judgment. (*Barker, supra,* 407 U.S. at p. 522.) But this principle does not dictate the result in the context of LPS conservatorship proceedings, where the Sixth Amendment does not apply and dismissal or reversal may not be in the conservatee's best interests. Based in part on these differences, we conclude that a due process violation based on pretrial delay in LPS conservatorship proceedings is not a structural error and may be found harmless on direct appeal under appropriate circumstances.

Although E.A. was deprived of due process by the lengthy pretrial delay, we conclude this due process violation was harmless beyond a reasonable doubt under the circumstances presented here. In the appealed conservatorship order, the trial court found that E.A. was gravely disabled, and there is no indication this finding would have been different if the pretrial delays had not occurred. Indeed, there is no indication E.A. was not gravely disabled during the entirety of the relevant period. The Court of Appeal was therefore correct to affirm the conservatorship order. But, because this matter has been rendered moot by subsequent events (see fn. 2, *post*), we reverse the judgment of the Court of Appeal and remand with directions to dismiss E.A.'s appeal as moot.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In August 2020, the director of the Contra Costa County Health Services Department, acting as the Public Guardian of Contra Costa County, filed a petition in the trial court for appointment of a temporary conservator and conservator over the person and estate of 23-year-old E.A. The Public Guardian alleged that E.A. was "[g]ravely disabled as a result of [a] mental disorder and unwilling to accept, or incapable of accepting, treatment voluntarily." In a supporting declaration, a licensed therapist provided the factual basis for the petition. She explained that E.A. was admitted to an inpatient mental health facility after she was found near a public transit station dressed only in her underwear. E.A. was disoriented and did not know what day it was or how she arrived at the station. A relative reported that E.A. was "talking to herself constantly, running out of the house naked, not taking her medications and sleeping excessive amounts of time." The relative stated that E.A. did not remain at home, and the relative had "picked [E.A.] up from different motels after different people have abused her." The therapist diagnosed E.A. with schizoaffective disorder, bipolar type. She wrote that E.A. was "disheveled, unkempt with poor hygiene." Her thoughts were "disorganized and she is disoriented with no insight into her illness or the reason for hospitalization." The therapist opined that E.A. was "unable to care for herself or be properly managed in the community, even with the support of her family."

The trial court imposed a temporary conservatorship over E.A.'s person and appointed the Contra Costa County Public Defender's Office to represent her. Two months later, E.A. accepted the conservatorship, the court found E.A. to be gravely disabled, and it appointed the Public Guardian as E.A.'s

conservator. She was placed at a secure mental health rehabilitation center for treatment.

In September 2021, the Public Guardian petitioned for reappointment as E.A.'s conservator. Two physicians opined that E.A. remained gravely disabled. A licensed therapist acting as a conservatorship investigator reported that E.A.'s symptoms "remain moderate to severe." E.A. was unable to care for herself, take her prescribed psychiatric medication, or participate in other treatment. The therapist believed that E.A. remained vulnerable to exploitation, and placement in a less restrictive or unlocked setting would be "potentially dangerous for her." E.A. accepted renewal of her conservatorship, the court again found E.A. to be gravely disabled, and it reappointed the Public Guardian as E.A.'s conservator.

A year later, in September 2022, the Public Guardian again petitioned for reappointment, with the supporting opinions of two physicians. At a hearing on the petition the next month, E.A.'s counsel requested a 30-day continuance, which the court granted. At the continued hearing, E.A.'s counsel requested a further continuance of two weeks, which the court again granted.

The next hearing was held on December 2, 2022. E.A. objected to the renewed conservatorship and requested a jury trial. The court set a trial date of January 3, 2023, over the objection of E.A.'s counsel, who apparently sought an earlier date. On the scheduled trial date, E.A.'s counsel stated that she was ready for trial, but the court continued the matter two additional weeks because the court was not available to proceed with trial. On the next trial date, E.A.'s counsel was again

ready, but the court was still unavailable. The court continued the matter an additional two weeks.

At the next trial date, on January 30, 2023, the Public Guardian's counsel was "unexpectedly out" because of an illness, and therefore the Public Guardian was unable to proceed. The trial court continued trial for a week, although the court believed trial was "unlikely to go . . . because of another trial having precedence." The next week, E.A.'s counsel said she was able to proceed with trial. The court expressed skepticism, noting that five or six trials had been scheduled for that day. E.A.'s counsel responded that if additional courtrooms had been available, her office would have staffed the matters accordingly. Counsel for the Public Guardian stated that she was not ready to proceed because she understood other matters to have priority. She said, "if we were given notice of a couple days before, that this would instead be a priority jury trial, we would be able to prepare for that." The court found that both counsel were unavailable and set another trial date in a month's time. E.A. filed a motion to dismiss the petition, which the court denied.

On the next trial date, March 6, 2023, the mental health rehabilitation center where E.A. was housed produced documents pursuant to a subpoena, and the Public Guardian moved for a continuance to review them. The trial court found good cause and granted the continuance. Its minute order further stated, "Both parties are unavailable because they are engaged in a jury trial for another client." E.A. moved to dismiss the petition, which the court again denied. The court proposed to set a further trial date approximately a month later. The court clerk noted that two jury trials and two court trials had

already been set for that date, but the court nonetheless believed the date would work.

At the next hearing, on April 11, 2023, E.A.'s counsel noted "court and counsel unavailability" and did not object to a continuance. The court continued the matter another month.

On May 8, 2023, both counsel were unavailable because they were engaged in another trial. Counsel for the Public Guardian nonetheless announced she was ready to proceed and represented that another attorney was available to handle the matter. E.A.'s counsel also asserted she was ready for trial. When the court asked E.A.'s counsel if another attorney was available to handle E.A.'s matter, she replied, "Should the court have an additional department available, we can provide additional staffing." The court found good cause to continue the matter, since E.A.'s counsel did not represent that a second attorney was presently available. It denied E.A.'s renewed motion to dismiss.

On July 10, 2023, the court found good cause to continue the matter again because the court was engaged in another trial. The trial judge stated that he had "consulted with the presiding judge and other departments" but "there [are] not other departments available." When a department became available, E.A.'s matter would be a priority. E.A. filed another motion to dismiss. The court scheduled the next hearing for July 24, 2023, but the record does not reflect any proceedings on that date.

The next hearing in the record took place on August 28, 2023. On that date, E.A. was present in court, as was her brother, whom the Public Guardian had called as a percipient witness. Both counsel represented they were ready to proceed. Before trial could start, however, E.A.'s counsel became

7

unavailable because another trial in a different department went forward. E.A.'s trial was continued to October 2, 2023.

In the meantime, in September 2023, the Public Guardian filed another petition for reappointment as E.A.'s conservator. This petition was also supported by the declarations from two physicians, who attested that E.A. was "still gravely disabled as a result of [a] mental disorder." As to this new proceeding, E.A.'s counsel filed a peremptory challenge under Code of Civil Procedure section 170.6 against the assigned trial judge, who had also been handling the pending 2022 reappointment petition. The challenge was accepted, and both matters were reassigned.

On October 2, 2023, before a new trial judge, the parties discussed logistics. The court was not available for a jury trial that day. The court ordered a short continuance, for two days, and noted that E.A.'s trial would be the highest priority trial on calendar. E.A.'s counsel filed another written motion to dismiss (her fifth such motion) the same day.

Two days later, the court announced that it had no courtrooms available for a jury trial. The court explained, "[A]ll of the trial departments that I was relying on not only are currently in time-not-waived [misdemeanor] jury trials . . . but [they] have backup jury trials once the current trial goes to deliberation." The court found good cause to continue the matter by five additional days, to October 9, 2023. The deputy public defender appearing for E.A. objected. Counsel for the Public Guardian noted, however, the deputy public defender who typically represented E.A. — and would be doing so at trial — was at that moment engaged in a different trial.

It appears E.A.'s counsel was still in trial when the matter was called again, so it was continued a further two days to October 11, 2023. On that date, both parties announced that they were ready to proceed. Over the objection of E.A.'s counsel, the court found good cause for another continuance because no courtrooms were available. The court told the parties the matter was "first" priority.

Nonetheless, on October 16, 2023, the court trailed the matter behind a different trial, and it scheduled a further hearing two days later. That day, October 18, the court informed the parties that no courtrooms were available. It explained that "two auxiliary departments are currently in time not waived criminal jury trials[,] each with a backup time not waived criminal jury trial to start" once those juries started their deliberations. The court intended to continue E.A.'s trial to October 23, but her counsel was scheduled to be in trial in a different matter. The court therefore found good cause to continue E.A.'s trial to November 6, 2023.

At the next hearing, E.A.'s counsel informed the court that she no longer requested a jury trial, and instead she requested a court trial. Despite this change, the court still had no available courtrooms to hear the matter. Over the objection of E.A.'s counsel, the court continued the matter to November 8, 2023. On that day, E.A. was ill and unable to attend court. The matter was continued again. E.A. was also unable to attend the next hearing, on November 13, 2023, because her residential unit was "on a quarantine" related to COVID-19. The court found good cause to continue the matter.

The matter was called for trial on November 28, 2023. At the outset, E.A.'s counsel informed the court that E.A. would

accept conservatorship by the Public Guardian, pursuant to an agreement that she would be housed in a less restrictive placement at a "super board and care" facility. The court and the parties discussed the fact that two reappointment petitions were currently pending. The court did not believe it could grant the earlier 2022 petition now that the later 2023 petition had been filed. The court entered a new placement order, but it deferred entering a formal conservatorship order until an updated investigator's report could be prepared. E.A.'s counsel stated that she was reserving her right to argue "the speedy-trial issue" on appeal. The court agreed.

The investigator's report stated that there were "few changes" in E.A.'s condition since the last report in October 2021. She remained gravely disabled due to mental illness. E.A.'s brother, who visited her regularly, concurred. In a phone call, E.A. denied having any mental illness or taking any psychiatric medications. E.A. said she did not like her current placement because they refused to feed her, "not one day at all." Staff at E.A.'s facility reported that she had been better with her hygiene practices, but frequently shouted insults at fellow patients and staff. They said E.A. denied having a mental illness and did not believe she needed to take psychiatric medications.

Based on this report and E.A.'s earlier agreement, the court granted the 2023 petition, found E.A. gravely disabled, and entered a formal order reappointing the Public Guardian as conservator of E.A.'s person. The court also ratified the good faith acts of the Public Guardian since the last conservatorship formally expired in 2022.

E.A. appealed the order reappointing the Public Guardian as her conservator. In an unpublished opinion, the Court of Appeal affirmed the reappointment order and directed the trial court to dismiss the earlier 2022 petition as moot. It held the trial delays E.A. experienced did not require that the conservatorship order be reversed. The court recognized that the LPS Act required trial to begin within 10 days of the proposed conservatee's demand, with a possible extension of 15 days, but it held that these deadlines were merely directory, not mandatory. (See fn. 4, *post*.) The court further held that E.A. had not established any violation of her constitutional right to due process. Following the four-factor framework discussed in *Barker*, *supra*, 407 U.S. 514, and adopted in *Camacho*, *supra*, 15 Cal.5th 354, the court assumed without deciding that the first factor (length of the delay) weighed in support of a due process violation. It also believed the third factor (assertion of rights) supported a violation. But it found the second factor (responsibility for the delay) less supportive because trial had been continued several times at the prompting of E.A. or her counsel. As to the fourth factor (prejudice), the court found that E.A. had not shown any. The court explained that there was "no reason on this record to question that E.A. remained gravely disabled when she agreed to extend her conservatorship in November 2023." Nor had E.A. shown that the delay " 'had [an] appreciable impact on [her] ability to present [her] defense.' " E.A. had therefore failed to establish a due process violation

based on delay. E.A. filed a petition for review in this court, which we granted.[2]

---

[2]     In January 2025, after this court granted review, the Public Guardian filed a motion in the trial court to terminate the conservatorship over E.A.'s person and dismiss the proceedings. The Public Guardian believed that E.A. was no longer gravely disabled and "the goals of the conservatorship have been reached." A supporting declaration explained that E.A. had consistently taken her prescribed psychiatric medication, engaged in activities at her board and care facility, and otherwise been successful in this placement over the previous seven months. E.A. had agreed to outpatient therapy and money management in the event the conservatorship was terminated. The trial court granted the motion and terminated the conservatorship. It directed the Public Guardian to ensure that a care coordination plan was in place for E.A., as required by statute. (§ 5361, subd. (c)(2).)

Because the underlying conservatorship has terminated, E.A.'s appeal challenging her conservatorship is now moot. (*Conservatorship of K.P.* (2021) 11 Cal.5th 695, 705–706, fn. 3 (*K.P.*); see 9 Witkin, Cal. Procedure (6th ed. 2025) Appeal, § 777, p. 797 ["an action that originally was based on a justiciable controversy cannot be maintained on appeal if all the questions have become moot by subsequent acts or events"].) We have observed that the problem of mootness "frequently arises in this area of law given the short duration of conservatorships." (*Conservatorship of Eric B.* (2022) 12 Cal.5th 1085, 1094, fn. 2 (*Eric B.*).) We therefore exercise our discretion to consider the issues raised in this matter, notwithstanding its mootness, "[b]ecause the case raises important issues capable of repetition but likely to evade review." (*Ibid.*) Given this approach, we need not consider whether E.A.'s acceptance of a conservatorship in 2023 also mooted her challenge to the delay in holding trial on the 2022 petition.

## II. DISCUSSION

### A. Statutory Framework

"The LPS Act governs the involuntary detention, evaluation, and treatment of persons who, as a result of mental disorder, are dangerous or gravely disabled." (*Conservatorship of John L.* (2010) 48 Cal.4th 131, 142 (*John L.*).) "The overall statutory scheme describes a detailed, calibrated system for intervention when circumstances indicate a person may be suffering from a mental health disorder. In addition to conservatorships, the [LPS] Act permits 3-day, 14-day, and 30-day involuntary detentions for intensive treatment." (*K.P.*, *supra*, 11 Cal.5th at p. 706.) Although only grave disability as a result of a mental disorder is at issue here, the LPS Act also authorizes detentions and conservatorships for "individuals who are imminently dangerous to themselves or others, or are impaired by chronic alcoholism." (*K.P.*, at p. 706, fn. 4.)

"When a treatment professional determines a person is gravely disabled and unwilling or unable to accept treatment voluntarily, the county's public guardian may petition to establish a conservatorship." (*Eric B.*, *supra*, 12 Cal.5th at p. 1095; see § 5352.) Grave disability, in this context, means the proposed conservatee "is unable to provide for their basic personal needs for food, clothing, shelter, personal safety, or necessary medical care." (§ 5008, subd. (h)(1)(A).) "The purpose of conservatorship . . . is to provide individualized treatment, supervision, and placement." (§ 5350.1.)

"[B]ecause the private interests implicated in an LPS conservatorship are significant, 'several layers of important safeguards' have been built into the system [citation] to 'vigilantly guard[] against erroneous conclusions' in such

proceedings." (*John L.*, *supra*, 48 Cal.4th at p. 151; see generally *id*. at pp. 151–152; *K.P.*, *supra*, 11 Cal.5th at pp. 707–710.) As relevant here, the proposed LPS conservatee may demand a court or jury trial on the issue of grave disability. (§ 5350, subd. (d)(1); see *Conservatorship of Roulet* (1979) 23 Cal.3d 219, 235 ["The due process clause of the California Constitution requires that proof beyond a reasonable doubt and a unanimous jury verdict be applied to conservatorship proceedings under the LPS Act"].)

By statute, the trial "shall commence within 10 days of the date of the demand, except that the court shall continue the trial date for a period not to exceed 15 days upon the request of counsel for the proposed conservatee." (§ 5350, subd. (d)(2).) "Failure to commence the trial within that period of time is grounds for dismissal of the conservatorship proceedings." (*Ibid*.)

If the court finds that the proposed conservatee is gravely disabled and appoints a conservator, the conservatorship automatically terminates after one year. (§ 5361, subd. (a).) If the conservator believes the conservatee remains gravely disabled at that time, the conservator may petition for reappointment for an additional one-year period. (*Id*., subd. (b).) The conservator may continue to petition for yearly reappointment for so long as a conservatorship remains necessary. A conservatee's right to a court or jury trial on the issue of grave disability applies in reappointment proceedings as well. (§ 5350, subd. (d)(3).)

## B. Pretrial Delays and Due Process

E.A. contends the pretrial delays she experienced violated her constitutional right to due process of law because the delay

nearly encompassed the entire one-year conservatorship period. We have not previously considered whether pretrial delays in this context can violate due process and, if so, how courts should identify whether a pretrial delay amounts to a constitutional violation.[3]

"An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.' " (*Cleveland Board of Education v. Loudermill* (1985) 470 U.S. 532, 542.) But " ' "[d]ue process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' [Citation.] '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' " (*Mathews*, *supra*, 424 U.S. at p. 334.)

In *Camacho*, *supra*, 15 Cal.5th 354, we considered a similar due process argument in the context of a different civil commitment scheme, the Sexually Violent Predator Act (SVP Act; § 6600 et seq.). Under the SVP Act, certain convicted sex offenders may be indefinitely committed if they "are found to have mental disorders that make them likely to reoffend after release from prison." (*Camacho*, at p. 367.) Like the LPS Act, the SVP Act "sets forth extensive administrative and judicial procedures for determining whether an individual is properly classified as an SVP." (*Camacho*, at p. 369.) Also like the LPS Act, the SVP Act allows a proposed SVP to request a jury trial on the ultimate question of whether the person is properly subject to involuntary commitment under the statutory scheme.

---

[3] In her briefing, E.A. refers to both the United States Constitution and the California Constitution, but she does not meaningfully distinguish between the two.

15

(*Camacho*, at p. 370.)  The proposed SVP in *Camacho* argued that a years-long delay in holding such a trial violated his right to due process.  (*Id.* at p. 368.)

In *Camacho*, we agreed with the proposed SVP that such a delay could, under appropriate circumstances, violate due process.  " 'The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." '  [Citation.]  Thus . . . individuals facing commitment under the SVP Act have a due process right to a timely trial."  (*Camacho, supra,* 15 Cal.5th at p. 379.)

We embrace the same principle here.  Like a proposed SVP, a proposed LPS conservatee has a due process right to an opportunity to be heard at a meaningful time and in a meaningful manner, which necessarily implies a due process right to a timely trial.

Indeed, neither party here disputes that a proposed LPS conservatee has a due process right to a timely trial.  What they do dispute is the appropriate framework for identifying a due process violation in this context.  This dispute presents a question of law that we consider de novo.  (*John L., supra,* 48 Cal.4th at p. 142; see *Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 ["Questions of law relate to the selection of a rule; their resolution is reviewed independently"].)

The Court of Appeal, following our opinion in *Camacho*, adopted the four-factor test announced in *Barker, supra,* 407 U.S. 514, which was developed to address a criminal defendant's right to a speedy trial under the Sixth Amendment. The Public Guardian agrees the *Barker* test is appropriate.  E.A. does not.  For the first time in this court, she contends the more

general due process frameworks described in *Mathews*, *supra*, 424 U.S. 319, and *Ramirez*, *supra*, 25 Cal.3d 260, should govern. We disagree and hold that the four-factor *Barker* test supplies the appropriate framework for considering whether a pretrial delay violates due process in this context.

*Barker* explained that the speedy trial right was "a 'slippery' one" because, among other things, "the accused may not actually want a speedy trial and may perceive a tactical advantage in delay." (*Camacho*, *supra*, 15 Cal.5th at p. 380.) Moreover, " 'the right to speedy trial is a more vague concept than other procedural rights.' [Citation.] 'We cannot definitely say how long is too long in a system where justice is supposed to be swift but deliberate.' " (*Ibid.*) Given these uncertainties, "the *Barker* court declined to adopt any bright-line rules for determining when the right has been violated. The court instead identified four factors for courts to examine: the length of the pretrial delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant caused by the delay. [Citation.] The defendant carries the 'burden of demonstrating a speedy trial violation under *Barker*'s multifactor test.' [Citation.] Because none of these factors is dispositive, 'courts must still engage in a difficult and sensitive balancing process' to determine whether trial has been unconstitutionally delayed." (*Ibid.*)

By contrast, the more general *Mathews* test provides three factors for courts to consider in determining whether a procedure is adequate to protect a person's right to due process under the federal Constitution: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute

procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (*Mathews*, *supra*, 424 U.S. at p. 335.) In *Ramirez*, this court identified a fourth factor that courts should consider when the due process guarantee of the California Constitution is at issue. This additional factor recognizes "the dignitary interest in informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story before a responsible governmental official." (*Ramirez*, *supra*, 25 Cal.3d at p. 269.)

In *Camacho*, we held that it was unnecessary for courts to consider the *Mathews* factors to determine whether a proposed SVP's due process right to a timely trial had been violated. (*Camacho*, *supra*, 15 Cal.5th at p. 379.) Instead, it was sufficient for courts to consider the four-factor *Barker* test. We noted that the *Barker* test had been employed beyond the strict confines of the Sixth Amendment right to a speedy trial, including allegedly unconstitutional delays in sentencing proceedings, in civil forfeiture proceedings, and in furnishing a reporter's transcript for use in a criminal appeal. (*Id.* at p. 380.) We concluded the *Barker* factors were "likewise appropriate for use in evaluating due process claims based on delays in holding SVP trials." (*Id.* at p. 381.) We observed that the significance of timing in SVP trials was similar in certain respects to its significance in criminal trials, including the possibility that a proposed SVP may not want a speedy trial and the impossibility of defining "with any precision a fixed point at which trial must occur." (*Ibid.*) To the extent differences between SVP trials and criminal trials might be relevant to the question of timing, we

held that "the flexibility of the [*Barker*] test allows courts to account for those differences." (*Ibid*.) The *Mathews* test, by contrast, focuses on "the value of additional procedural safeguards for the sake of reducing error." (*Id*. at p. 382.) It is therefore "more clearly suited to questions about the adequacy of procedures used in government decisionmaking than to questions about the timing of those decisions." (*Ibid*.)

For similar reasons, we conclude that the *Barker* factors, not the *Mathews* test, supply the appropriate framework for assessing pretrial delays in LPS conservatorship proceedings. LPS conservatorship proceedings are analogous to SVP proceedings in that they involve a singular trial, with a jury right, that may lead to involuntary commitment upon an adverse verdict. Additional features of LPS conservatorship proceedings, like SVP proceedings, support the use of the *Barker* factors. For example, the person subject to potential involuntary commitment (or that person's counsel) may have a tactical incentive to delay the proceedings. "From the individual's perspective, allowing more time for treatment may ultimately improve the chance of success at trial, insofar as treatment may help address a mental disorder" that would otherwise lead to involuntary commitment. (*Camacho*, *supra*, 15 Cal.5th at p. 377; see *id*. at p. 381 [some individuals "may perceive a tactical advantage in delay"].) Although a proposed LPS conservatee may have a lesser incentive to delay the proceedings than a proposed SVP, given the limited duration of an LPS conservatorship, a proposed LPS conservatee may still desire a delay if the outcome of a timely trial would be unfavorable. Further, because due process is a flexible concept, no bright-line rule exists to define a constitutional violation, and the *Barker* factors properly account for that uncertainty. (*Id*. at

p. 381.)[4]   Thus, the "broadly relevant set of functional, case-dependent factors" identified in *Barker* and adopted in *Camacho*, at page 381, should be applied to LPS trial delays as well.  Again, to the extent the LPS context differs from either criminal trials or SVP proceedings, "the flexibility of the [*Barker*] test allows courts to account for those differences." (*Ibid.*)

E.A. argues that *Camacho* is distinguishable because the SVP commitment at issue there was of indefinite duration, whereas an LPS conservatorship is limited to one year.  While this difference may affect the analysis of any particular alleged violation of due process (see pt. II.C., *post*), *Camacho* did not rely on the fact of indefinite duration as a reason to adopt the *Barker* test, and the limited duration of an LPS conservatorship does not undermine the rationales outlined above for the application of the *Barker* test in the LPS context.  These rationales center on the unusual characteristics of the speedy trial right and the analogous due process claim based on pretrial delay.  *Camacho*'s reasoning applies here because a similar type of pretrial delay is at issue.  E.A. has provided no persuasive explanation why

---

[4]   While the LPS Act requires a conservatorship trial to begin within 10 or 25 days (§ 5350, subd. (d)(2)), the Courts of Appeal have held that this statutory deadline is merely directory, not mandatory. (See, e.g., *Conservatorship of A.H.* (2025) 114 Cal.App.5th 227, 248 (*A.H.*); *Conservatorship of T.B.* (2024) 99 Cal.App.5th 1361, 1386 [directory deadline allows trial courts to "retain the flexibility to accommodate circumstances beyond a party's control" for the benefit of both the proposed conservatee and the public].)  E.A. does not argue otherwise, and the issue is not within the scope of these proceedings.   We therefore need not express any opinion regarding the directory or mandatory nature of this statute.

the difference in commitment periods should result in the adoption of the more general test in *Mathews* and *Ramirez*, to the exclusion of the more tailored *Barker* test.[5]

More generally, E.A. contends the *Barker* test is inadequate because it does not explicitly require courts to address the dignitary interests of an individual. As noted, in *Ramirez*, *supra*, 25 Cal.3d at page 269, we held that courts examining a due process claim under the California Constitution must consider, in addition to the *Mathews* factors, "the dignitary interest in informing individuals of the nature, grounds and consequences of the [proposed government] action and in enabling them to present their side of the story before a responsible governmental official."

Although this dignitary interest is not explicitly identified in *Barker*, it is necessarily subsumed within its test. The first *Barker* factor, the length of the pretrial delay, reflects the same concern with an individual's ability to be heard as the dignitary interest identified in *Ramirez*. An excessive pretrial delay necessarily impacts an individual's ability to be heard.

---

[5] As noted above and discussed further below, courts should consider the *Barker* factors in context, which necessarily differs depending on the type of proceeding at issue (e.g., LPS conservatorship, SVP commitment, or criminal proceedings). As relevant here, we note that a criminal conviction may result in a lengthy term of imprisonment, and in the usual course a criminal trial represents a defendant's only opportunity to contest the issue of guilt. By contrast, LPS conservatorships must be renewed each year, and an LPS conservatee may contest the issue of grave disability at each renewal. Consequently, what constitutes a timely trial in the LPS context is compressed into a shorter and more definite timeframe than a criminal proceeding, and any interest a proposed LPS conservatee may have in delaying trial is more bounded.

Similarly, the fourth *Barker* factor, the prejudice to the defendant caused by the delay, encompasses dignitary interests as well as substantive ones. For example, we held in *Camacho* that the "anxiety and concern" felt by a proposed SVP may be considered under this factor. (*Camacho*, *supra*, 15 Cal.5th at p. 392.) As such, under the *Barker* test, courts may take into account whether an individual has been "treated with respect and dignity" in the context of a pretrial delay. (*Ramirez*, *supra*, 25 Cal.3d at p. 268.)

E.A. also contends the *Barker* test is inadequate and inappropriate precisely because it requires consideration of "prejudice to the defendant caused by the delay" as one factor in its analysis. (*Camacho*, *supra*, 15 Cal.5th at p. 380.) She points out that *Mathews* and *Ramirez* do not explicitly identify prejudice as a factor. E.A.'s contention is unpersuasive. *Mathews* and *Ramirez* require courts to consider an individual's private interest and how it will be impacted by the government's action. (*Mathews*, *supra*, 424 U.S. at p. 335; *Ramirez*, *supra*, 25 Cal.3d at p. 269.) This consideration is similar to *Barker*'s prejudice factor, which likewise considers harm to an individual.

Moreover, having found that an individual facing involuntary commitment (like a proposed SVP or LPS conservatee) has a due process right to a timely trial, we are not constrained by *Mathews* or *Ramirez* from refining the basic due process framework to assist courts in determining *when* a trial becomes so untimely that it impinges on an individual's constitutional rights. In *Camacho*, we adopted the *Barker* test and its prejudice component because it was specifically designed to address the constitutional import of a pretrial delay. "The *Barker* test outlines a broadly relevant set of functional, case-dependent factors to consider in analyzing questions of trial

timing." (*Camacho*, *supra*, 15 Cal.5th at p. 381.) As a more specific test, the *Barker* factors do not simply replicate the *Mathews* and *Ramirez* factors. They reflect different areas of emphasis and concern, and the inclusion of prejudice helps to identify due process violations in the context of the "slippery nature of the speedy trial right" where — unlike other possible violations of due process — the proposed SVP or LPS conservatee may have an interest in pretrial delay. (*Id.* at p. 380.) Thus, E.A. is incorrect that pretrial delay necessarily impacts an LPS conservatee's dignitary interests and compels a finding that due process has been violated, without considering any other factors.[6]

E.A. cites *People v. Allen* (2007) 42 Cal.4th 91 in this context, but that case is inapposite. In *Allen*, we considered whether the deadline for filing a recommitment petition under the former Mentally Disordered Offenders Act (MDO Act; Pen. Code, § 2960 et seq.) was mandatory or directory. (*Allen*, at pp. 94–95.) We held that the deadline was mandatory, and the district attorney's failure to file a timely recommitment petition invalidated the court's purported action on the untimely

---

[6] E.A. also fails to acknowledge that, under *Mathews* and *Ramirez*, a court may consider prejudice when deciding whether a person who suffers a due process violation is entitled to relief. (See, e.g., *People v. Allen* (2008) 44 Cal.4th 843, 870–872 [violation of due process in denying proposed SVP the opportunity to testify at trial was not reversible error because the due process violation was harmless beyond a reasonable doubt]; *Conservatorship of Jose B.* (2020) 50 Cal.App.5th 963, 974 (*Jose B.*) [consideration of *Mathews* factors was unnecessary to determine whether a proposed LPS conservatee had suffered a due process violation based on pretrial delay because the conservatee had not shown prejudice].)

petition. (*Id.* at p. 104.) We rejected the Attorney General's argument this result was unjustified unless the defendant could show a due process violation and prejudice. (*Ibid.*) We noted, "more often than not, an MDO would be unable to show prejudice if his or her mental disorder is not in remission." (*Id.* at p. 105.) But because the district attorney failed to file a timely recommitment petition, the MDO "was denied his annual review under the MDO Act, which may be deemed prejudicial." (*Ibid.*) Unlike the defendant in *Allen*, E.A. does not contend here that the conservatorship order below must be invalidated based on a failure to comply with a mandatory statutory deadline. In any event, unlike the failure to meet a mandatory deadline, the due process right to a timely trial is not defined by a bright-line rule, and as discussed, a consideration of prejudice is helpful and appropriate to assist a court in identifying when a due process violation has occurred.[7]

In sum, the *Barker* test is tailored to the unusual type of due process violation at issue here, whereas the test in *Mathews* (and *Ramirez*) is "more clearly suited to questions about the adequacy of procedures used in government decisionmaking." (*Camacho*, *supra*, 15 Cal.5th at p. 382.) E.A. has not shown otherwise. We therefore conclude, following our reasoning in

---

[7] E.A. also appears to argue that, under the circumstances of this case, no showing of prejudice should be required. We address the circumstances of this case in the next part. E.A.'s case-specific arguments do not show that the adoption of the *Barker* factors, including its prejudice factor, is incorrect as a general matter. We observed in *Camacho* that "none of these factors is dispositive" in any particular case. (*Camacho*, *supra*, 15 Cal.5th at p. 380.) " '[C]ourts must still engage in a difficult and sensitive balancing process' to determine whether trial has been unconstitutionally delayed." (*Ibid.*)

*Camacho*, that courts should use the *Barker* factors to assess a claimed due process violation based on pretrial delay in an LPS conservatorship proceeding.[8]

## C. Application to These Proceedings

Applying the *Barker* test, the Court of Appeal below held that the pretrial delay in this case did not violate due process. E.A. contends the Court of Appeal was incorrect. We employ independent review to decide whether a due process violation occurred. (*People v. Ault* (2004) 33 Cal.4th 1250, 1264, fn. 8; see *People v. Vivar* (2021) 11 Cal.5th 510, 527–528; *Conservatorship of B.C.* (2016) 6 Cal.App.5th 1028, 1034.) Under this standard, we agree with E.A. that she was denied due process of law under the circumstances here when her conservatorship trial was

---

[8]    E.A. additionally contends that adoption of the *Barker* factors here violates equal protection because LPS conservatees are situated differently from criminal defendants. E.A. did not raise this contention below, so we may therefore consider it forfeited. E.A. also did not properly raise it in her petition for review, so we may disregard it. (See Cal. Rules of Court, rule 8.516(a)(1).)  However, it is plainly meritless.  The application of the *Barker* test in this context does not subject E.A. to the same standards as a criminal defendant. The test is flexible and context-specific, and as discussed it should be applied with awareness of the differences between criminal proceedings and LPS conservatorship proceedings. Moreover, even accepting E.A.'s claim that she is being treated similarly to a criminal defendant, E.A. has not established an equal protection violation. An equal protection violation arises when one class of individuals is treated *differently* from another class, not when the two classes are treated *similarly*. (See *People v. Lewis* (2025) 111 Cal.App.5th 1078, 1102 [" 'If the two groups . . . are not being treated differently, then there can be no equal protection violation' "]; see also *People v. Hardin* (2024) 15 Cal.5th 834, 847 [an equal protection violation requires "unequal" or "differential treatment"].)

delayed for almost a year, effectively swallowing the one-year conservatorship that was the precise issue to be tried. However, as we explain in the following part, even if this matter were not moot, E.A. would not be entitled to reversal of the trial court's conservatorship order based on this due process violation because the violation was harmless beyond a reasonable doubt.

The first *Barker* factor is the length of the pretrial delay. (*Barker*, *supra*, 407 U.S. at p. 531; *Camacho*, *supra*, 15 Cal.5th at p. 383.) The significance of the delay's length must be considered with reference to this factor's animating principles and the legal and factual context in which the delay arises. The length of the delay may be important because it may serve as a proxy for the potential harm to a defendant or proposed LPS conservatee. (*Barker*, at p. 530.) The context here includes the statutory time limit for holding an LPS conservatorship trial, which the Legislature has fixed at 10 days from the date of demand. (§ 5350, subd. (d)(2).) This 10-day period can only be extended "upon the request of counsel for the proposed conservatee" and only for a further 15 days. (*Ibid*.) The context here also includes the statutory time limit for an LPS conservatorship itself, which is one year. (§ 5361, subd. (a) ["Conservatorship initiated pursuant to this chapter shall automatically terminate one year after the appointment of the conservator by the superior court"].) This statutory time limit reflects the Legislature's intent that conservatees enjoy the full panoply of procedural protections under the LPS Act each year, including trial if demanded by the conservatee. Indeed, as one lower court has observed, "The prohibition of indefinite periods of confinement of the gravely disabled was one of the most important reforms of the LPS Act." (*Conservatorship of Kevin M.* (1996) 49 Cal.App.4th 79, 89.)

In this case, E.A. demanded a jury trial on December 2, 2022. The matter was not called for trial until November 28, 2023. In the context of an LPS conservatorship proceeding, the length of this delay is significant. It far exceeds the Legislature's 10-day (or even 25-day) deadline for holding an LPS conservatorship trial. It also nearly eclipses the one-year duration of an LPS conservatorship. The length of this delay raises the possibility of prejudice because it departs so significantly from the Legislature's prescribed deadline and effectively nullifies the requirement that trial occur *before* a one-year conservatorship is imposed. (See *Conservatorship of Joanne R.* (2021) 72 Cal.App.5th 1009, 1013 ["A conservatee's right to a jury trial has little meaning if the conservatee can only exercise that right after spending nine months of a one-year term in a custodial setting"].)

The second *Barker* factor is the reason or reasons for delay. (*Barker*, *supra*, 407 U.S. at p. 531; *Camacho*, *supra*, 15 Cal.5th at p. 383.) Under this factor, both the responsibility for the delay and the reasons for delay are relevant. (*Camacho*, at p. 384.) If the government is at fault, a deliberate "effort at manipulation 'should be weighted heavily' " against it. (*Ibid.*) " 'A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.' " (*Ibid.*) By contrast, delays sought by the defendant (or proposed LPS conservatee), including by or through counsel, "weigh against" a claim that the delay violates due process. (*Id.* at p. 385.)

In this case, the causes of the nearly year-long delay were numerous and varied, but they were primarily caused by resource constraints and court congestion. E.A. or her counsel were responsible for a few continuances. For example, a trial call on August 28, 2023, appears to have been continued because E.A.'s counsel was unavailable to proceed, and E.A. was ill or in quarantine on November 8 and November 13, 2023, resulting in additional continuances. But trial calls on February 6 and March 6, 2023 were continued at least in part because the Public Guardian was unable to proceed, and trial court unavailability appears to have been the sole cause of continuances on January 3, January 17, July 10, October 2, October 4, October 11, October 16, October 18, and November 6, 2023. Moreover, the record reflects that the length of certain continuances was related to court congestion, with the trial court observing that the trial departments available for a court or jury trial were limited and criminal trials took precedence.

Overall, the history of delays in this case lends moderate support to E.A.'s due process claim. The delays attributable to the government stemmed from resource and logistical constraints, rather than any specific or deliberate effort to delay E.A.'s trial in particular or conservatorship trials in general. These delays should therefore " 'be weighted less heavily but nevertheless should be considered.' " (*Camacho, supra,* 15 Cal.5th at p. 384.)

The third *Barker* factor is the individual's "assertion of his right to a timely trial." (*Camacho, supra,* 15 Cal.5th at p. 390; see *Barker, supra,* 407 U.S. at p. 531.) This factor "does not hinge on ' "the number of times the accused acquiesced or objected; rather, the focus is on the surrounding circumstances, such as the timeliness, persistence, and sincerity of the

28

objections, the reasons for the acquiescence, whether the accused was represented by counsel, the accused's pretrial conduct (as that conduct bears on the speedy trial right), and so forth. [Citation.] The totality of the accused's responses to the delay is indicative of whether he or she actually wanted a speedy trial." ' [Citation.] Viewing the complete picture matters because '[t]he more serious the deprivation [of the right to a speedy trial], the more likely a defendant is to complain.' " (*Camacho*, at p. 390.)

This factor, too, is supportive of E.A.'s due process claim. E.A. repeatedly demanded that her conservatorship trial be set, she drew attention to the extended pretrial delay, and she filed five motions to dismiss the proceedings based on excessive delays. For example, on July 10, 2023, E.A.'s counsel moved for dismissal based on "egregious" trial delays and argued that E.A. had effectively "been conserved without due process." Similarly, on October 2, 2023, E.A.'s counsel stated she "has been waiting for a time-not-waived jury trial since December 2nd of 2022 on an old petition." The delay was so long that the Public Guardian had filed a new reappointment petition, which in the view of E.A.'s counsel "effectively den[ied] [E.A.'s] due process rights to a jury trial in the first petition." However, E.A.'s demand for a jury trial was preceded by a six-week delay that she requested and received. This initial delay shows that E.A. was willing to put off her trial and did not necessarily want a speedy trial at all costs. Nonetheless, as the Court of Appeal below concluded, "there is no question that from December 3, 2022, E.A. was persistent in her request for a jury trial and asserting her right to prompt adjudication."

The final *Barker* factor is "prejudice to the defendant." (*Barker*, *supra*, 407 U.S. at p. 532; see *Camacho*, *supra*,

15 Cal.5th at p. 391.) Although this factor, like all *Barker* factors, is derived from the criminal context, it transfers less easily to proceedings outside a criminal prosecution and must be applied with awareness of its origin.

In a criminal case, trial delay is presumptively prejudicial because "a period of lengthy pretrial delay may impose real detriment to an individual's ability to mount a defense; defense witnesses may die, disappear, or lose their memory of the relevant events." (*Camacho*, 15 Cal.5th at p. 391.) In *Camacho*, we held that no presumption of prejudice should be employed in the SVP context because "trial on a petition for commitment under the SVP Act aims to establish whether a person meets the definition of an SVP *at the time of trial*. This inquiry is categorically different from that of a criminal trial, where the issue is whether the defendant's past conduct constitutes guilt of a particular offense. In the SVP context, then, time ordinarily will not erase critical evidence for the defense, since the jury relies on recent expert evaluations to evaluate whether the individual qualifies as an SVP at the time of trial." (*Id.* at p. 392.) The same reasoning applies here. The issue for the jury in an LPS conservatorship trial is whether the proposed conservatee is gravely disabled at the time of trial. Although past events may be relevant to this issue, the focus of trial is the proposed conservatee's present condition. As such, the risk of prejudice to the defense based on excessive delay is not inherent in the delay itself and does not support a presumption of prejudice.

Likewise, in a criminal case, a lengthy pretrial delay may result in pretrial detention. Such detention may often be "oppressive" to the individual facing trial. (*Barker*, *supra*, 407 U.S. at p. 532.) If an SVP or LPS conservatee is

involuntarily committed, it likewise "entails a severe and oppressive restriction on liberty" and may result in the loss of a job and disruption to social and familial bonds. (*Camacho, supra,* 15 Cal.5th at p. 392; see *John L., supra,* 48 Cal.4th at p. 150 ["There can be no doubt that '[t]he liberty interests at stake in [an LPS] conservatorship proceeding are significant' "].) But involuntary commitment is not oppressive in the same way as pretrial criminal detention. Involuntary commitment results in confinement to a hospital or treatment facility, not jail. A proposed SVP or LPS conservatee "begin[s] receiving mental health treatment while they await trial. [Citations.] Pretrial treatment of the underlying mental disorder that caused the state to seek commitment in the first place may ultimately facilitate the individual's release before trial." (*Camacho,* at p. 393.)

Indeed, the involuntary commitment of proposed LPS conservatees is generally intended to and does benefit the conservatees themselves, so pretrial detention in the LPS context is even less inherently prejudicial than the SVP context we explored in *Camacho.* " 'The sole state interest, legislatively expressed, [in LPS conservatorships] is the custodial care, diagnosis, treatment, and protection of persons who are unable to take care of themselves and who for their own well-being and the safety of others cannot be left adrift in the community. The commitment may not reasonably be deemed punishment either in its design or purpose. It is not analogous to criminal proceedings.' " (*Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1015 (*Susan T.*).) Similarly, the high court has explained that involuntary commitment of a mentally ill person differs significantly from the involuntary detention of a person accused or convicted of a crime. A "genuinely mentally ill person" is not

benefitted, and may instead be harmed, by freedom from confinement. (*Addington v. Texas* (1979) 441 U.S. 418, 429.)

Nonetheless, a showing of prejudice under this factor is by no means impossible for a person awaiting an LPS conservatorship trial. As noted, involuntary commitment, even for mental health treatment, "entails a severe and oppressive restriction on liberty that may give rise to feelings of anxiety and concern." (*Camacho, supra*, 15 Cal.5th at p. 392.) In addition, "conservatees may lose the rights to drive, vote, enter contracts, and make decisions about their treatment." (*Eric B.*, *supra*, 12 Cal.5th at pp. 1103–1104.) Depending on the circumstances, the burdens imposed by a conservatorship may result in financial, professional, or personal hardship. Moreover, if a person's suitability for commitment or other restrictions is uncertain or subject to substantial dispute, "the amount of prejudice may increase as the length of the delay increases." (*Camacho*, at p. 393.) Finally, if a proposed LPS conservatee can show that delay carries the risk of impairing the proposed conservatee's ability to present a defense, such a showing will carry substantial weight because impact to a proposed conservatee's defense is "the 'most serious' interest" protected by the right to due process in this context. (*Id.* at p. 391.)

When we analyzed this factor in *Camacho*, we noted at the outset that "the delay . . . had no appreciable impact on [the proposed SVP's] ability to present his defense." (*Camacho*, *supra*, 15 Cal.5th at p. 393.) We further observed that the proposed SVP had received one favorable and two potentially favorable expert reports several years earlier. (*Ibid*.) We explained, "The length of delay since that point — approximately seven years — is significant, and [the proposed

SVP] has been involuntarily committed throughout that period."
(*Ibid*.) Under these circumstances, we found "some amount of
prejudice . . . but no indication that the delay has undermined
the fairness of the proceedings." (*Ibid*.)

Here, E.A. has likewise failed to show that the delay
hampered her ability to present a defense. Indeed, it does not
appear she had any substantial defense to the Public Guardian's
allegation that she was gravely disabled. Every expert who
examined E.A. concluded she was gravely disabled, and her
family did not disagree. E.A. voluntarily accepted
conservatorships in 2020 and 2021. Even after the extensive
delay at issue here, E.A. again voluntarily accepted a
conservatorship in 2023. In other words, E.A. ultimately did not
even contest the issue on which she demanded trial.[9]

E.A. points to the agreed disposition in 2023 regarding her
conservatorship, which included a provision for E.A. to step
down to a less secure facility. She contends the pretrial delay
led to a delay in her change in placement. E.A. misreads the

---

[9] E.A. suggests that her 2023 acceptance of a
conservatorship should be discounted or disregarded because it
was somehow caused by the extended delay. E.A.'s argument is
unpersuasive. As the Court of Appeal explained below, "[T]here
is nothing in this record to suggest that E.A.'s ability to prepare
for trial or her defense to the allegations was impaired by the
delay. There is also no reason on this record to question that
E.A. remained gravely disabled when she agreed to extend her
conservatorship in November 2023. The investigator's report for
this most recent commitment prepared in late 2023 plainly
states that her condition remained essentially unchanged since
she was evaluated in October 2021. Moreover, the agreed
disposition of the September 2023 petition was announced when
her trial was to begin, and she could have proceeded to trial on
that day."

record of proceedings below.  The change in placement was the result of an agreement with the Public Guardian, not trial.  E.A. could have pursued this agreement at any point following the Public Guardian's reappointment petition.  The timing of the agreement was not restricted by the timing of trial.

We may presume that E.A. suffered some amount of prejudice as a result of her involuntary commitment during the period of delay, including the harm to E.A.'s dignitary interest inherent in the court's failure to hear her case in a timely manner.  However, because that commitment was primarily directed toward her treatment, and took place in a secure facility for her own safety and protection, the prejudice resulting from the fact of commitment is less than in the criminal context.  Nor has E.A. shown that she suffered any significant anxiety or distress as a result of the pretrial delay specifically.  In one motion to dismiss, E.A.'s counsel stated that E.A. has "great anxiety and concern" as a result of her involuntary confinement, but it was unsupported by any declaration (from E.A. or her counsel).  It was also vague regarding the source of these feelings and their extent.  It is insufficient to show prejudice.  E.A. claims her family members were impacted as well because they had to attend "numerous hearings."  E.A. does not support this claim by reference to any specific hearings, and it appears that her family was only required to attend one hearing that ultimately proved unnecessary.  Even assuming that the impact on a proposed conservatee's family by a pretrial delay may be considered under this *Barker* factor, E.A.'s showing is insufficient.  Thus, while E.A. suffered some prejudice as a result of her involuntary commitment, it was not substantial, especially in light of her acceptance of conservatorships both before and after the period of delay.

After identifying the facts relevant to each factor, " 'courts must still engage in a difficult and sensitive balancing process' to determine whether trial has been unconstitutionally delayed." (*Camacho*, *supra*, 15 Cal.5th at p. 380.) In doing so, we keep in mind that these factors are "functional" and "case-dependent," and they should be applied with "flexibility" and sensitivity to the context of each case. (*Id*. at p. 381; see *Barker*, *supra*, 407 U.S. at p. 530 ["A balancing test necessarily compels courts to approach speedy trial cases on an *ad hoc* basis"].)

We conclude that E.A. suffered a due process violation when her LPS conservatorship trial was delayed by nearly a year. The first factor, the length of the delay, supports this finding. Because E.A.'s conservatorship trial was delayed by almost a year, it effectively nullified the procedural protections that should be satisfied *before* an LPS conservatee suffers such a lengthy involuntary commitment. The second factor, responsibility for the delay, supports this finding as well. The reasons for the delay were varied and in part caused by E.A. or her counsel. However, it appears the bulk of the delay was caused by trial court congestion and resource constraints, which are chargeable against the government. The third factor, the individual's assertion of her due process right, also supports a finding that due process was violated. After an initial delay, E.A. clearly and repeatedly requested that her LPS conservatorship trial be set. The final factor, prejudice, weighs against a finding that due process was violated. E.A. has not shown she suffered any prejudice beyond the fact of the delay itself and any associated impingement on her liberty that it necessarily caused. However, given her substantial showing under the first factor, and the moderately supportive showings

under the second and third, E.A. has demonstrated a violation of her right to due process of law based on pretrial delay.

## D. Remedy

The existence of a due process violation is separate from the possibility of a remedy. In *Camacho*, which involved a different procedural context, we declined to address the proper remedy when a court identifies a due process violation based on pretrial delay in a civil commitment proceeding. (*Camacho*, *supra*, 15 Cal.5th at p. 382, fn. 5.) We observed, "In the criminal context, *Barker* instructs that the sole remedy for a Sixth Amendment speedy trial violation is dismissal of the prosecution — an 'unsatisfactorily severe remedy,' but, in the high court's view, the 'only possible' one." (*Ibid*.) However, in the noncriminal context, other courts had "suggested that there may be other possible remedies for unreasonable delays in this context." (*Ibid*.) For example, one federal appellate court held that, even if a person subject to involuntary commitment suffers a due process violation due to pretrial delay, "the proper remedy would not be dismissal of the certification [i.e., commitment petition] and release, but conducting the hearing and determining on the merits whether [the person] should be committed as a 'sexually dangerous person' " under federal law. (*United States v. Timms* (4th Cir. 2012) 664 F.3d 436, 455, fn. 19 (*Timms*).)

We conclude that, at least in the context of LPS conservatorship proceedings, a due process violation based on pretrial delay is subject to harmless error analysis. Further, in a direct appeal alleging such a due process violation, the violation may be found harmless where the LPS conservatee has been found to be gravely disabled and a court can conclude

beyond a reasonable doubt that the result would have been the same — that is, the court would have imposed a conservatorship — in the absence of the delay.

In general, an error — even a constitutional error — may be found harmless if it meets the applicable standard for determining harmlessness. "There is a strong presumption any error" may be found harmless, "and it is the rare case in which a constitutional violation will not be subject to harmless error analysis." (*People v. Marshall* (1996) 13 Cal.4th 799, 851.) Errors that are not subject to harmless error analysis are deemed " 'structural' " errors, and they require reversal regardless of the surrounding circumstances. (*In re Christopher L.* (2022) 12 Cal.5th 1063, 1074 (*Christopher L.*).)

In *Christopher L.*, we considered whether an error in a juvenile dependency proceeding was subject to harmless error analysis or was a structural error that was reversible per se. (*Christopher L.*, *supra*, 12 Cal.5th at p. 1069.) We observed that structural errors more commonly arise in criminal proceedings, and we cautioned "against 'import[ing] wholesale, or unthinkingly,' the analysis of structural error from criminal cases into other contexts." (*Id.* at p. 1074.) Nonetheless, the concept of a structural error is not limited to the criminal context, and we had never foreclosed its use in dependency proceedings. (*Id.* at pp. 1074–1075.) To determine whether the error at issue was structural, we referred to the high court's opinion in *Weaver v. Massachusetts* (2017) 582 U.S. 286 (*Weaver*), which discussed how to identify errors that are not amenable to harmless error analysis and are therefore structural errors that are reversible per se. (*Christopher L.*, at p. 1077.)

*Weaver* explained that various rationales have been offered to support the determination that an error is structural. "First, an error has been deemed structural in some instances if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest," such as a criminal defendant's right to conduct his or her own defense. (*Weaver, supra*, 582 U.S. at p. 295.) "Second, an error has been deemed structural if the effects of the error are simply too hard to measure. For example, when a defendant is denied the right to select his or her own attorney, the precise 'effect of the violation cannot be ascertained.'" (*Ibid*.) "Third, an error has been deemed structural if the error always results in fundamental unfairness. For example, if an indigent defendant is denied an attorney or if the judge fails to give a reasonable-doubt instruction, the resulting trial is always a fundamentally unfair one." (*Id*. at p. 296.)

*Christopher L.* found that none of these rationales supported the conclusion that the error in that case was structural. (*Christopher L., supra*, 12 Cal.5th at pp. 1077–1081.) The error at issue in *Christopher L.* was a juvenile court's failure "to appoint counsel [for an incarcerated parent] or provide for [the parent's] presence at the combined jurisdiction and disposition hearing" in a dependency case. (*Id*. at p. 1076.) We concluded the first *Weaver* rationale did not support a determination of structural error because the parent's own interest in participating in the proceedings was "not easily distinguished" from the broader interest in "protect[ing] the parent from an erroneous determination," which can be addressed through harmless error analysis. (*Id*. at p. 1077.) We concluded the second *Weaver* rationale was likewise unsupportive because it was possible, without speculation, to

assess what would have happened had the incarcerated parent and counsel been present at the hearing. (*Id.* at p. 1078.) Indeed, in the Court of Appeal, the parent had not attempted to show how the juvenile court's orders would have been different if he and his counsel had been present. (*Id.* at p. 1079.) Finally, with respect to the third *Weaver* factor, we concluded that absence of an incarcerated parent and his counsel does not always result in fundamental unfairness in every case. (*Id.* at p. 1081.) We noted that a rule of "automatic reversal for errors that do not invariably lead to fundamental unfairness would exact a particularly steep cost," given the profoundly negative consequences of delay and uncertainty in the dependency context. (*Ibid.*)

Applying the *Weaver* framework here also leads to the conclusion that the error is not structural. The first *Weaver* rationale may apply "if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest." (*Weaver*, *supra*, 582 U.S. at p. 295.) Although in the criminal context the speedy trial right is arguably separate from the merits of a criminal prosecution, no strict separation exists in the LPS conservatorship context. Instead, as explained above, the right to a timely trial in an LPS conservatorship proceeding stems from an individual's due process right to be heard " ' "at a meaningful time and in a meaningful manner." ' " (*Camacho*, *supra*, 15 Cal.5th at p. 379.) It serves primarily to protect and make effective a person's procedural right to a court or jury trial under the LPS Act. As we have explained, "the most important interest" in this context is "the 'possibility that the defense will be impaired' " because impairment to an individual's ability to present a defense " 'skews the fairness of the entire system.' " (*Id.* at p. 391.) In

this way, like in *Christopher L.*, the proposed LPS conservatee's interest "is not easily distinguished" from the broader "interest in the accuracy of the proceedings." (*Christopher L., supra*, 12 Cal.5th at p. 1077.)

The second and third *Weaver* rationales are likewise inapplicable. It is not the case that the effects of a lengthy pretrial delay "are simply too hard to measure." (*Weaver, supra*, 582 U.S. at p. 295.) A lengthy delay may or may not have an effect on the defense a proposed LPS conservatee presents at trial, but it is straightforward to identify such an effect because it would impact the evidence offered at trial (or not offered, as the case may be). The record of an LPS conservatorship proceeding will generally reflect evidence for and against the proposed conservatorship at numerous points throughout the proceedings, including at trial. Based on this record, a court will generally be able to determine whether any pretrial delay was prejudicial. Further, a lengthy pretrial delay would not be expected to result "in fundamental unfairness" as a general matter. (*Id.* at p. 296.) In the context of a lengthy pretrial delay, the protections of the LPS Act still apply. Trial is delayed, but it must still take place in order for an LPS conservatorship to be imposed. In the interim, a proposed LPS conservatee may challenge the conservatorship if the proposed conservatee is no longer gravely disabled. (See, e.g., *People v. Tilbury* (1991) 54 Cal.3d 56, 64 [petition for writ of habeas corpus].) This situation is therefore unlike the example in *Weaver*, where the high court observed, "if an indigent defendant is denied an attorney or if the judge fails to give a reasonable-doubt instruction, the resulting trial is always a fundamentally unfair one." (*Weaver*, at p. 296.) No similar structural unfairness arises as a result of a lengthy pretrial delay. This conclusion is

supported, as it was in *Christopher L.*, by the focus in LPS conservatorship proceedings on a proposed conservatee's present condition, rather than any specific historical fact. (*Christopher L.*, *supra*, 12 Cal.5th at p. 1081.) A lengthy delay does not invariably foreclose a fair determination of this issue.[10]

Further, as in *Christopher L.*, a determination that a lengthy pretrial delay is structural error in this context would be particularly disruptive. (See *Christopher L.*, *supra*, 12 Cal.5th at p. 1081.) An LPS conservatee who has been found gravely disabled, even after a lengthy trial delay, still requires the care and treatment that an LPS conservatorship provides. It would serve neither the public interest nor the LPS conservatee's own interest to terminate the conservatorship. It would also be wasteful and unnecessary to require a new, even more delayed trial following appeal and reversal for structural error. A new trial would not remedy the previous delay, and it would be even further removed from whatever time in the past the trial should have occurred.

While *Barker* held that "the only possible remedy" for violation of the speedy trial right was "the unsatisfactorily severe remedy of dismissal of the indictment" (*Barker*, *supra*, 407 U.S. at p. 522), its reasoning does not apply here. The speedy trial right in a criminal proceeding is an independent right, guaranteed by the Sixth Amendment. (See *United States v. MacDonald* (1982) 456 U.S. 1, 8 ["The Sixth Amendment right to a speedy trial is thus not primarily intended to prevent

---

[10] It is possible that an assessment of harmlessness will be impossible under the specific circumstances of a given case. But this possibility does not support a rule of automatic reversal in every case. (*Christopher L.*, *supra*, 12 Cal.5th at p. 1082.)

prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitations"].)  If this speedy trial right is violated, there is no way it can be cured because any satisfactory remedy could only involve going back in time and holding a timely trial.  By contrast, the speedy trial right in the context of an LPS conservatorship proceeding is not an independent right.  As noted, it derives from an individual's due process right to be heard " ' "at a meaningful time and in a meaningful manner." ' " (*Camacho*, *supra*, 15 Cal.5th at p. 379.)  Such a right is amenable to harmless error analysis, as discussed above. "Categorization of an error as structural represents 'the exception and not the rule.' " (*People v. Sivongxxay* (2017) 3 Cal.5th 151, 178.)

Moreover, even if the speedy trial right has some independent force in this context, the numerous and significant differences between criminal proceedings and LPS conservatorship proceedings would still foreclose "the unsatisfactorily severe remedy" that the *Barker* court felt compelled to impose.  (*Barker*, *supra*, 407 U.S. at p. 522.)  "As much as the private interests at stake are weighty and deserving of protection, the stated purposes of the LPS Act foreclose any argument that an LPS commitment is equivalent to criminal punishment in its design or purpose."  (*John L.*, *supra*, 48 Cal.4th at p. 151; see *Susan T.*, *supra*, 8 Cal.4th at p. 1015 ["We find no similarity between the aims and objectives of the act and those of the criminal law"].)  What we have stated in the dependency context applies equally here:  "In a criminal case, reversal of a criminal judgment is virtually always in the defendant's best interest.  The situation in a dependency

case" — or an LPS conservatorship case — "is often different."
(*In re Celine R.* (2003) 31 Cal.4th 45, 59.)

The conclusion that a lengthy pretrial delay is not
structural error is generally consistent with prior case law
considering such delays in the context of LPS conservatorships.
For example, in *Jose B.*, *supra*, 50 Cal.App.5th at page 974, the
court found a lengthy pretrial delay "troubling" but affirmed an
LPS conservatorship order because the conservatee had not
"shown he was prejudiced by the delay." (*Ibid*.) Similarly, in
*Conservatorship of James M.* (1994) 30 Cal.App.4th 293, 299,
the court believed dismissal of an LPS petition by a trial court
would be appropriate after a lengthy pretrial delay only "where
the delay in the proceedings has proved prejudicial to the
conservatee's interests."

It appears that only one lower court has reversed an LPS
conservatorship order after finding a due process violation based
on lengthy pretrial delay. (*A.H.*, *supra*, 114 Cal.App.5th at
p. 268.) The import of this reversal, however, is somewhat
unclear. The focus of the *A.H.* court's inquiry was whether the
trial court's failure to consider the *Barker* factors in ruling on a
proposed LPS conservatee's motion to dismiss was harmless.
(*Id*. at p. 257.) The *A.H.* court found that the *Barker* factors
supported a due process violation, so the trial court's error was
not harmless. (*Id*. at pp. 267–268.) It therefore reversed the
conservatorship order, but it did not provide directions to the
trial court. It noted the underlying conservatorship had ended,
so it need not address whether the finding of a due process
violation would require the conservatee's release. (*Id*. at p. 268,
fn. 23.) Ultimately, therefore, the *A.H.* court did not consider

the issue of automatic reversal on the merits, so it has no bearing on the discussion herein.[11]

In her briefing, E.A. relies heavily on the dignitary interest discussed in *Ramirez, supra,* 25 Cal.3d at page 269. But this interest, like the *Barker* factors we apply here, assists courts in identifying when due process has been violated, i.e., when a person has been deprived of meaningful notice and an opportunity to be heard. Our consideration of a person's dignitary interest in this context does not mean that any impingement on a person's dignitary interest is necessarily structural error. A person's dignitary interest informs what procedures and protections are required as a matter of due process, but the failure to adhere to those procedures and protections may be found harmless in an appropriate case.

We caution that our discussion of harmless error here arises in the specific context of a direct appeal from an order imposing a conservatorship. A reviewing court's dispositional options in this context are limited by fundamental principles of appellate procedure. (See generally *F.P. v. Monier* (2017) 3 Cal.5th 1099, 1107–1109; Cal. Const., art. VI, § 13; Code Civ. Proc., § 475.) By contrast, a trial court that has identified a due

_____

[11] In the context of an SVP proceeding, several lower courts have held that dismissal or reversal is the only appropriate remedy when a proposed SVP has suffered a due process violation based on lengthy pretrial delays. (See, e.g., *People v. DeCasas* (2020) 54 Cal.App.5th 785, 813; *People v. Superior Court* (*Vasquez*) (2018) 27 Cal.App.5th 36, 83, fn. 30.) These opinions follow *Barker* but do not engage in any extensive analysis regarding whether *Barker*'s remedy should apply. While we need not comment on the question of remedy in the SVP context, we do not find these opinions persuasive on the remedy issue before us.

process violation based on the *Barker* factors has other options available to address the violation or remedy such a delay, including but not limited to an order requiring trial to take place within a reasonable time. Similarly, a reviewing court considering a petition for writ of mandate alleging a due process violation may order appropriate remedial measures, if warranted by the circumstances of a given case. (See *Timms*, *supra*, 664 F.3d at p. 455, fn. 19.) A proposed LPS conservatee who has suffered a due process violation might consider pursuing relief prior to trial, including a writ petition if appropriate, to avoid the possibility that the violation will be held harmless on direct appeal from a future conservatorship order.

In any event, in this direct appeal, because a violation of due process in this context is not structural error, it may be found harmless under the appropriate standard of prejudice. We need not consider what standard applies because the error here was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24.) As discussed, in the appealed conservatorship order, the trial court found that E.A. was gravely disabled. E.A. does not challenge this finding or contend that it would have been different if the pretrial delay had not occurred. Indeed, when the court finally called the matter for trial, E.A. did not contest the Public Guardian's allegation of grave disability and accepted a further one-year conservatorship. Further, based on the entire record, there is no indication that E.A. was not gravely disabled throughout the period of delay. Under these circumstances, there can be no reasonable doubt that the trial court would have found E.A. gravely disabled and ordered a conservatorship, even if E.A.'s

45

conservatorship trial had been held in a timely fashion. As such, the due process violation based on pretrial delay was harmless.

Thus, although the Court of Appeal was incorrect to find that E.A. had not suffered a due process violation as a result of the pretrial delay, it was correct to affirm the order of conservatorship. Subsequent events, however, have rendered this appeal moot. (See fn. 2, *ante*.) We therefore reverse the judgment of the Court of Appeal and remand with directions to dismiss E.A.'s appeal as moot.

Notwithstanding this result, we emphasize, as we did in *Camacho*, that the trial court has a "vital role . . . in safeguarding the timely trial right" of LPS conservatees. (*Camacho*, *supra*, 15 Cal.5th at p. 368.) State and local governments likewise have an obligation to devote sufficient resources to courts and counsel, as well as ancillary services, to ensure timely adjudication. As one lower court has written, "We are mindful that the resources of the trial court, the Public Guardian, and the public defender's office are stretched thin, particularly after the pandemic. We also recognize that the Public Guardian carries out an important (and perhaps thankless) public service in LPS cases. We imagine that individuals coming to the Public Guardian's attention regularly appear so clearly in need of care and protection that confinement under a temporary conservatorship is necessary for their health and safety. Finally, we understand that the number of LPS defendants demanding a court or jury trial may fluctuate, with the spikes causing a strain on the system. But the Legislature has set forth a timeline for LPS cases with all these concerns in mind, and that timeline must be followed. It is the responsibility of the court, the Public Guardian, and the public defender to dedicate the resources to do so." (*A.H.*, *supra*,

114 Cal.App.5th at p. 269.)  We add today that failure to meet this responsibility not only runs afoul of the statutory timeline, but it may also violate fundamental principles of constitutional due process.

### III. CONCLUSION

When a proposed LPS conservatee challenges a lengthy pretrial delay on due process grounds, courts should apply the *Barker* factors to identify a due process violation.  If a court identifies a violation, it is not structural error and may be found harmless under appropriate circumstances, including where, as here, the LPS conservatee has been found gravely disabled and there can be no reasonable doubt that the trial court would have made the same finding if the pretrial delay had not occurred. The Court of Appeal was therefore correct to affirm the conservatorship order.  However, because subsequent events have rendered this appeal moot, we reverse the judgment of the Court of Appeal and remand with directions to dismiss the appeal as moot.

**GUERRERO, C. J.**

**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**EVANS, J.**
**DELANEY, J.**[*]

---

[*]      Associate Justice of the Court of Appeal, Fourth Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

CONSERVATORSHIP OF E.A.

S287241


Concurring Opinion by Justice Liu


Today's opinion correctly finds that E.A., a Lanterman-Petris-Short Act (LPS Act; Welf. & Inst. Code, § 5000 et seq.) conservatee, was denied due process of law when she repeatedly sought but did not receive a trial for nearly a year, the term of her conservatorship.  (Maj. opn., *ante*, at pp. 2–3, 25–26, 35–36.)  That delay "effectively nullified E.A.'s right to a meaningful opportunity to be heard prior to the deprivation of her liberty."  (*Id.* at p. 2.)  I further agree that a violation of an LPS Act conservatee's speedy trial right may be found harmless on direct appeal and was harmless in this case.  (Maj. opn., *ante*, at pp. 36, 44–46.)

I write to emphasize the weighty dignitary interests here.  The due process clauses in California's Constitution require the government to treat each person "as an equal, fully participating and responsible member of society."  (*People v. Ramirez* (1979) 25 Cal.3d 260, 267 (plur. opn. of Mosk, J.); see *id.* at p. 279 (conc. & dis. opn. of Bird, C. J.); Cal. Const., art. I, § 7, subd. (a); *id.*, § 15.)  Due process entails procedures that actualize our " 'collective judgment that human beings are important in their own right, and that they must be treated with understanding, respect, and even compassion.' "  (*Ramirez*, at p. 268 (plur. opn. of Mosk, J.).)  A " ' "fundamental requirement" ' " is a meaningful opportunity for a person to be heard when the government seeks to deprive the person of liberty.  (Maj. opn., *ante*, at p. 16.)  The Legislature recognized that obligation when

1

it guaranteed proposed conservatees "the full panoply" of rights, including a trial, each time the government seeks to renew a conservatorship petition. (*Id.* at p. 26.) In situations like E.A.'s, where pretrial delays effectively "eclipse[d]" the duration of the conservatorship (*id.* at p. 27), a proposed conservatee has no opportunity to be heard. This matters, even if the opportunity to be heard is unlikely to affect whether the person is found gravely disabled.

The court's analysis and holdings today follow from the posture of this case — a direct appeal long after E.A. accepted a reappointment petition and long after the contested petition expired. (Maj. opn., *ante*, at p. 44 ["We caution that our discussion of harmless error here arises in the specific context of a direct appeal from an order imposing a conservatorship."].) Accordingly, the court observes that an infringement on a proposed conservatee's dignity is not "necessarily structural error" on direct appeal. (*Ibid.*) But a proposed conservatee seeking to enforce her right to a timely trial may secure appropriate relief without demonstrating reversible error in other procedural postures, such as on a petition for writ of mandate after a trial court's rejection of a speedy trial motion. (*Id.* at pp. 44–45.) In such cases, courts should accord proper weight to the denial of a proposed conservatee's right to be heard. Giving substance to that right is at the heart of what it means for government to respect the inherent dignity of each person.

**LIU, J.**

**We Concur:**

**KRUGER, J.**
**GROBAN, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Conservatorship of E.A.

---

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)** XX NP opn. filed 8/28/24 – 1st Dist., Div. 1
**Rehearing Granted**

---

**Opinion No.** S287241
**Date Filed:**  July 23, 2026

---

**Court:**  Superior
**County:**  Contra Costa
**Judge:**  Frank Riebli

---

**Counsel:**

Brian C. McComas, under appointment by the Supreme Court, for Objector and Appellant.

Charles M. Denton, Public Defender (Alameda), for the California Public Defender Association as Amicus Curiae on behalf of Objector and Appellant.

Thomas L. Geiger, County Counsel, Steven P. Rettig, Assistant County Counsel, Nina Dong and Andrea L. Russi, Deputy County Counsel, for Petitioner and Respondent.

Jennifer Bacon Henning for the California State Association of Counties as Amicus Curiae on behalf of Petitioner and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Brian C. McComas
The Law Office of B.C. McComas, LLP
PMB 1605, 77 Van Ness Avenue, Suite 101
San Francisco, CA 94102
(415) 814-2465

Andrea L. Russi
Deputy County Counsel
1025 Escobar Street, 3d Floor
Martinez, CA 94553
(925) 655-2216